### GRAHAM v. GRAHAM.

(Supreme Court, Appellate Division, Third Department.   May 7, 1913.)

1. DIVORCE (§ 184*)—APPEAL—REVIEW OF EVIDENCE.
   In reviewing the evidence in divorce actions for adultery, the appellate court should look carefully beyond the finding to the evidence on which the finding of adultery rests.
   [Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 570–573; Dec. Dig. § 184;* Appeal and Error, Cent. Dig. § 564.]

2. DIVORCE (§ 129*)—PROOF—ADULTERY.
   Mere opportunity of committing adultery is not proof of the commission of the acts, so as to authorize a divorce; evidence of a desire and purpose being essential.
   [Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 411–441, 454; Dec. Dig. § 129.*]

3. DIVORCE (§ 129*)—ACTIONS—SUFFICIENCY OF EVIDENCE—ADULTERY.
   Evidence in a divorce action *held* not to sustain a finding of adultery committed by defendant.
   [Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 411–441, 454; Dec. Dig. § 129.*]

Appeal from Trial Term, Washington County.

Action by Richard B. Graham against Lottie C. Graham.   From a judgment for plaintiff, defendant appeals.   Reversed.

Rogers & Sawyer, of Hudson Falls (Erskine C. Rogers, of Hudson Falls, of counsel), for appellant.

O. A. Dennis, of Whitehall, for respondent.

WOODWARD, J.   The complaint alleges the marriage of the parties at Putnam, N. Y., on or about the 29th day of August, 1895, and that one daughter, 15 years of age, has been born to them; that "since the date of said marriage, and on or about the 16th day of October, 1912, at Putnam, Washington county, N. Y., the defendant committed adultery with one Thomas Anderson." Upon information and belief other acts of adultery are charged, but the learned justice before whom the case was tried has found the specific adultery as charged, and it is not necessary to consider the other allegations; no evidence having been introduced to support them.

[1] If the interlocutory judgment in this case is sustained, it must be because it requires less evidence to support an alleged breach of the marriage contract than would be necessary in almost any other relation of life; for the facts brought out upon the trial do not arise to the dignity of proof, and are entirely consistent with innocence of the offense charged, though undoubtedly lacking in the element of discretion and good taste.   The weight of evidence, which ordinarily is determined under our system by a jury in which temperamental considerations are largely balanced, depends so much upon the mental attitude of the individual called upon to try the issues of fact that it is often important, in giving consideration to the fact that the court

has the witnesses before it, and is therefore better qualified in a measure to determine the weight to be given to the testimony, to get the viewpoint from which the evidence is regarded. Men who, in determining a question of fact relating to the title of real estate, would accurately determine the weight of evidence, in a question affecting the marriage relation might be entirely governed by their standards of morals, by their preconceived ideas of what a woman should or should not do under a given state of facts, and it becomes the duty of the appellate courts, in reviewing determinations of this character, to look carefully beyond the findings of fact, and to the evidence on which the conclusion rests, and in doing so to give to the parties that protection, in a measure, at least, which comes from the balancing of personalities in the jury box.

We have nothing to do with the questions of good taste nor of abstract morality involved in any of the alleged transactions between the defendant and the co-respondent in this case. We are to examine the evidence and see if it supports the finding of adultery on the 16th day of October, 1912—not whether we think the co-respondent acted properly in visiting this woman on that date; and in this view of the question it is important to note the attitude of the trial justice in examining the co-respondent, who was called as a witness in behalf of the defendant. The witness had answered frankly in reference to his relations with the defendant—had testified positively that he had never committed adultery with her; that he had never had any improper relations with her. The court then took the witness in hand, and brought out that he was a second cousin; that the defendant "is my mother's own cousin." Following this the witness was asked in relation to some letters he had written to the defendant, and which will be considered later, and then the court asked:

"What is the reason, Mr. Anderson, when you went there, that you crawled through a window?"

There was no evidence that the co-respondent crawled in. The window appears to have been a low French window, and the defendant said to him, "You can step right in this way" (folio 134); and there is nothing to indicate that this was not as available a method of entering the place as any other. The court then continued:

"Whatever induced you to go in that way?"

The witness having answered the question, the court continued:

"And on the opposite side of the house from the neighbor's house? * * * You were in this house some hours without any light with Mrs. Graham? * * * It is compromising the woman in case it was known that that thing had happened. Suppose you knew that two people who had been about together a good deal, and one of them was a married woman and having trouble with her husband, were found in that situation; wouldn't you think it was suggestive or wrong, of compromising and making people suspect? You knew that, didn't you? * * * What other conclusions would you draw from two people, if they had spent three hours together in a dark house, and then, when some one comes there, he runs away and loses his hat—what other conclusion would you draw than that there was wrong conduct be-

tween the two? * * * What made you do it? * * * Wasn't it very unfortunate that she went to the man that she was suspected of wrong conduct with? You knew there had been conversation about your conduct with her, didn't you? You knew, on account of the conversation with Mr. Graham? * * * Didn't you know, then, that it was unfortunate for you to be the man that was there to give her counsel?"

It is easy to see from these questions, the most of which were answered substantially in the affirmative, the mental attitude of the court. Abstractly it will be assumed that they indicate the correct moral standard; but the question at issue is not one of abstract morals. It is one relating to a statutory offense, and the fact that the co-respondent at the time of the trial might be convinced that it was wrong for him to have acted as he did on this particular occasion has no tendency to prove that he committed a crime at the time alleged, and it is easy to conceive how he might, with the best of intentions, have done just what he says he did, and no more than he says he did. Honest and honorable men have done indiscreet things in an effort to lessen the sum of human misery, and they have been misjudged. Putnam is a small rural community. The defendant is 17 years older than the co-respondent. The latter was about 18 years of age when she was married. They had always known each other, and, so far as appears, both the defendant and her husband had been on good terms with the co-respondent up to within a year or so of the time of this alleged adultery, and the co-respondent had lived in the family as a hired man, performing the work incident to such employment in a rural community. So far as appears, the witness was the only male relative of the defendant in the immediate locality, though it appears she had a brother some 15 miles away; and having been a member of the family, and knowing the treatment to which the defendant had been subjected, what was there unnatural in the fact that she should go to this cousin for advice and counsel? What man, under such circumstances, would refuse to consult with her, even though he was obliged to escape the attention of local gossips, to meet her under the circumstances set forth in the evidence?

The evidence discloses clearly enough that the plaintiff is not coming into court clean-handed. His own brother testified that he knew the plaintiff was going with a girl, and several of his witnesses indicate something of the same character, and the plaintiff had offered $1,000 to be relieved of the presence of the defendant, and when she had promised to accept the terms he refused to perform, and it appears had deceived her into believing that he had gone away, while he was in fact attempting to procure evidence which would save him from parting with his $1,000 and at the same time relieve him of his obligations as a husband. That the defendant should feel the need of advice under such circumstances, and that she should go to her cousin for such advice, is certainly not strange, nor does it indicate moral turpitude on her part. The arrangement was made to meet at the home of the co-respondent's father, and there is no dispute that the defendant went there to meet him for the purposes of this interview over her troubles. There was company at the co-respondent's home,

and the defendant did not remain; she having told the co-respondent to come to her house after he was through at the store, where he was engaged as a clerk, after his work was done, if, for any reason, they should not meet at the place of original appointment.

Measured from the standpoint of conventional morality, which looks only to the form, it was undoubtedly a mistake for the co-respondent to go to the defendant's home late in the evening and to stay there for several hours without a light; but their purpose, as they explain it, was to be alone for the purpose of talking over the defendant's troubles, and with a hostile neighbor, who appears to have had a faculty for jumping at conclusions from a very small foundation of facts, it may have been equally as prudent to sit in the dark as to have a light to attract the attention of this neighbor. Both the defendant and the co-respondent, who were there, testify positively that they did not commit adultery, and, aside from the fact that there was the opportunity, there is absolutely no evidence of any desire or intent to commit adultery on this occasion. True, one of the plaintiff's witnesses was permitted to testify that the plaintiff told him that on looking over the house, after the co-respondent left, he found one of the beds mussed; but the plaintiff had two witnesses with him at the time and did not let them into the house, and we have no direct testimony upon this point. It is hearsay, and the party making the statement, the plaintiff in this action, was incompetent. Section 831, Code Civil Procedure. Where or how the bed was mussed—if this was in fact true—is not disclosed, and there is an absolute lack of competent evidence of anything which would indicate that there had been any misconduct on the part of the defendant and the co-respondent on the night of October 16, 1912, aside from the admitted fact that they were alone in the kitchen of the defendant's home from about 9:30 until midnight, at which time the plaintiff appeared, and for the most of the time at least without a light.

[2] Clearly the mere opportunity of committing adultery is not proof that the wrong has been done. As we understand the rule, it is necessary, not only that there should be the opportunity, but that there should be evidence of a desire and purpose. There should be something in the conduct of the parties from which it may be properly inferred that, given the opportunity, they would indulge their passions; and it is important, therefore, to consider the evidence in relation to the previous conduct of these parties.

The first witness called was the meddlesome neighbor, a woman who lived 20 or 30 rods from the defendant's home. She testified that in the fall of 1910 she saw the defendant and the co-respondent go into the plaintiff's barn between the hours of 8 and 9 in the morning, and that she saw them come out nearly an hour after, and that the plaintiff was away from home at the time. On her cross-examination it developed that she swore that the plaintiff was away, because it was his day to be away; but she had no recollection of seeing him go away, and in fact knew nothing about it. It also appeared that the co-respondent was at the time employed by the plaintiff and lived

at the house, and the evidence is undisputed that the defendant was engaged in raising chickens and carried on a business on her own account, and the fact that the defendant and the hired man may both have been in the plaintiff's barn at a particular time in broad daylight is certainly not inconsistent with the orderly and lawful discharge of the day's duties on the part of both of them. Moreover, this witness was obliged to admit that they may not have stayed in the barn all the time; that she did not pretend that she watched all of the time from the moment that she saw them enter until she saw them come out, at or near 11 o'clock; so that this testimony merely amounts to showing of the abstract facts that at one time she saw them going into the barn, across the street from the house, and that at another time she saw them coming out. They may have been in and out every few minutes, so far as this witness knew, and if the husband was away, and there was any purpose to commit adultery, why was it necessary for them to leave the house and cross the highway in full view of this neighbor? Certainly it is not difficult to see in this alleged "inclination of the parties to commit adultery" (and this is the avowed object of its introduction) an entirely innocent transaction, such as might easily happen in the case of two persons actively engaged in the work of a farm. There is not a suggestion of any conduct on the part of either defendant to indicate any lasciviousness on their way to the barn, nor is anything said as to what occurred in the barn; and we have merely the bald facts, coupled with the declaration of the witness that they were alone and that the plaintiff was away, and which it appears she knew nothing about, except from her inductive reasoning and a desire to be a useful witness.

The next witness called in this effort to show the "inclination of the parties to commit adultery" was a brother of the plaintiff. This witness testified that in the fall of 1910 he was present at a place known as "Quinn's Camp"; that he got there about 8 o'clock; that Tom Anderson, the co-respondent, and Mrs. Graham, were not in the room where they were singing; that about 9 o'clock he went out upon the veranda and lit a match, and found Mrs. Graham in Tom Anderson's lap; that—

"she had her arms around his neck, holding his head to her bosom, trying to shield his face, and we lit a match to find out who it was. I found out it was Tom Anderson. I went back into the house and left them. The plaintiff was not there."

This witness says that Mrs. Graham came into the house at 12 o'clock on the night in question, and that no one was with her. On cross-examination this witness said:

"I did not tell my brother about this affair; no reason to. I didn't think enough of it to call my brother's attention to it."

And the only fair inference from the testimony is that there was a camping party, and these two people were on the veranda, where people were at liberty to appear at any moment, and that when the witness went out made some effort to hide the identity of the co-re-

spondent; but it was a matter of such trifling importance that the plaintiff's own brother does not appear to have regarded it as of any moment, and it was merely such an incident of a rural camping party as might happen at any time without exciting adverse comment among those who associated with them. This witness testified that the party consisted of Mrs. Quinn, Alice McIntyre, Grace Patterson, Mary Wright, Herbert Allen, Mrs. R. B. Graham, and Tom Anderson; that he (the witness) was invited down by the girls, and that they all went out on the veranda and saw the two parties, and then returned to the house; but none of these parties are called upon to testify, with the exception of Herbert C. Allen, and the incident does not seem worthy of serious consideration. It was probably no more than a piece of horse-play, such as might be witnessed at any gathering of this kind in a rural community, and which many people regard as constituting fun.

The witness Allen next called, went into details about this scene on the porch at Quinn's Camp, but testified positively that Mrs. Graham was not sitting in Anderson's lap, though he adds that she might just as well have been; and he says that when the others came out, and the match was lighted to discover who was there, that they "were all laughing and talking," and it is plain that it was not considered anything out of character in the society in which these parties were moving. This occurred in August or September, 1910, two years and more before the alleged adultery, and it is interesting to note, in the unfoldment of the evidence, how the intervening time is filled in— how this alleged Lothario and this alleged adulteress, living in a small community, where their every act would be noted, conducted themselves.

The next witness called, a boy of 16, testified that some time in July, 1912, he was passing an open-fronted shed used by the community as a toolhouse; that he heard some one speak, and that he walked to the entrance, lighted a match, and saw the defendant standing there looking at him. This was about 10 o'clock in the evening. The witness says he did not speak; that Mrs. Graham did not speak. He is quite sure that no one else was present; that he could see all over the interior of the shed; and he says that he heard no one running away or moving, and that he at no time heard more than one voice, and that this was, he thought, a woman's voice. What possible bearing this can have upon the defendant's alleged adulterous purpose it is difficult to comprehend.

The next witness, and the only other witness who testifies in behalf of the plaintiff as to any act between the episode in 1910 and the alleged adultery in October, 1912, is George H. Sanders. This witness testifies that he lives in Ft. Edward; that he recollects an occasion in the fall of 1911, about September, being at Ticonderoga; that he saw Mrs. Graham there; that she was at her brother's, and that Anderson was with her; that they left the brother's at about 9 o'clock in the evening; that no one else was with them; that the plaintiff was not there; that it was about 15 miles from Ticonderoga to the

residence of the plaintiff. On cross-examination this witness said he thought defendant's father was present at the time Mrs. Graham was in Ticonderoga, and that he did not think there was anything wrong for these cousins to come there together; that he did not know whether her husband knew they were there together. It is in evidence, however, without dispute, that plaintiff did know they were there together, and there is not a single fact stated in reference to this trip which was not entirely consistent with the highest moral standards.

This same witness testified to another time that he saw the defendant. He visited at the home of the Grahams in November, 1911. Anderson was present. They all played cards. When the game was over, Graham left the room and returned, bringing a check. He is quoted as saying that he owed the co-respondent the amount of the check:

"There is a check for that amount; take it and get out."

The witness says:

"He says, 'I have always trusted you, and I supposed you were faithful to me.' Anderson asked him what was the matter. He accused him of being intimate with his wife. Mr. Anderson said he lied. Mr. Graham told him that he did not lie; that he had it in black and white. He had letters he had written to his wife. He didn't deny them; that is, Mr. Anderson didn't say anything."

Down to this time there is clearly no evidence of any disposition on the part of either the defendant or the co-respondent to commit adultery; not a single lascivious act is brought out, and, when the plaintiff accused Anderson of having been intimate with his wife, Anderson promptly denounced the assertion as a lie, but did not deny as he does not now deny, that he wrote the defendant some letters. When these alleged letters were written does not appear from the plaintiff's witnesses; but Mrs. Graham fixes their date as of September or October two years ago, so that the alleged letters must have been practically of the same date as the Quinn Camp episode, and the learned justice, referring to that, says:

"I shall not hold any wrongdoing from the occurrence there, except that it shows acquaintance."

We thus have a period of practically two years preceding the 16th day of October, 1912, during which time not a single act is pointed out which would justify any fair inference that either Mrs. Graham or Mr. Anderson had any inclination to commit adultery. Not a single fact is disclosed which is not consistent with absolute innocence; for, though there is some suggestion that Anderson had been seen to lie upon the defendant's bed with her, the undisputed evidence of the plaintiff himself is that he was present at the time and that he made no objection to it, and the explanation is made that this occurred when the defendant was ill, and that it was on a Sunday, and that it was in the presence, not alone of the plaintiff, but of his daughter, who it was conceded would testify, if called, that she had never seen any improper acts upon the part of her mother or Anderson.

Where, then, is the evidence to support this interlocutory judgment? Where is the evidence which would justify the conclusion that Anderson or the defendant had any inclination to commit adultery? Is it possible that these two people, looking for an opportunity to commit adultery, could so deport themselves in a small community that no one could be produced who would testify to some act of lustful import in all that time? From the fall of 1910 to the 16th day of October, 1912, no act inconsistent with the obligations of a wife are pointed out, though the parties were often together; and yet it has been found as a fact that on the 16th day of October, 1912, Mrs. Graham and the co-respondent committed an act of adultery, though both of them deny this under oath, and no fact is disclosed in support of the decision, except that the parties were together under circumstances which would have permitted of the act. Again we say, Where is the evidence? It all comes back to the testimony of Mr. Sanders, who tells of the remarkable occasion where the plaintiff, after eating supper and playing cards with Anderson, the defendant, and the witness, suddenly discharged the co-respondent and charged him with having debauched his wife. This witness says that at this time the plaintiff—

"accused him [Anderson] of things that were in the letters. I don't know as I can remember it all. He asked her if she ever took an alcohol bath. He claimed there was something of that kind in the letters; that he was going to be away, and he was glad, and he would come down and put her to bed and give her an alcohol bath."

The witness was then asked:

"Did he state anything from the letters about arranging the curtains?"

And answered:

"To be there, and have a signal in the window; whether it was curtains, or light, I don't know."

At this point the court took up the examination and inquired who used those words. The witness replied:

"Mr. Graham claimed that that was in the letter; he stated to Anderson that was in the letters."

The court then asked if either of them made any reply, and was answered:

"Not to deny it."

The witness then stated his recollection of the further conversation between the plaintiff and the defendant, wherein the defendant accused the plaintiff of doing the same thing she was doing, that she was no worse than he was, and that the plaintiff demanded to know what was meant by a reference in the letters to getting rid of Mr. Graham and having the place, saying that there was something of this kind in the letters. It does not appear, however, that either of them admitted anything of this kind, and the witness then recounts

some conversation with the defendant on the following morning, in which he says that the defendant admitted that she had been upon the bed with Anderson; but this has already been under consideration, and is of no consequence in support of the judgment. He says that the defendant admitted that she had done wrong, but what she understood by doing wrong does not appear, and it may very well relate to the fact that she had encouraged the co-respondent to write to her, under the circumstances which she narrates in her own testimony, and is clearly not an admission of adultery.

The plaintiff admits that while she was a substitute mail carrier, and while Anderson was employed by her husband, and was engaged in carrying cream for the latter, she asked Anderson, whom she saw at home every night and morning, to write her letters and to drop them in some of the letter boxes along the road, and that she would find them and thus know what he was doing during the day; that she suggested this just for fun, and she apparently found a certain amount of diversion in looking through the boxes to find these missives. She admits that she thought the suggestion made in one of these in reference to giving her an alcoholic bath was not proper; but Anderson says it was made in connection with the fact that the defendant's daughter bathed her arm every night after the trips carrying the mails, and that he had this in mind. It does not appear, however, that Anderson ever wrote any more letters after this particular one which the defendant thought improper, and the mere fact that a green country boy makes a vulgar suggestion, and which the defendant did not approve, is clearly not evidence of the desire for adultery on the part of the latter, which would give importance to the meeting at her home on the 16th of October, when she was in trouble and was seeking advice.

And the suggestion of signals is very far-fetched, when it is remembered that Anderson was in the employ of the defendant, and had free access to the house, where he lived, and did not need any signals to know when the plaintiff and his daughter were away. The probability is that this woman, working hard all the time, had some need of diversion, and this rather silly expedient of asking Anderson, her cousin, to write notes to her and to drop them in some of the rural delivery boxes along his way, that she might find them and pick them up, was hit upon for this purpose, and which could have done no harm, except for the plaintiff's desire to get rid of his own obligations. But, whatever there was of this correspondence, it took place two years before this alleged adultery, and in the two years intervening there is not a single act which tends to characterize the relations between Anderson and the defendant as adulterous in its purpose.

[3] The improbability of the proposition that this adulterous desire could exist and not manifest itself in some overt act, which would attract the attention of some of the gossips, is so great, and the character of the supporting testimony is so questionable and uncertain, and the meeting of October 16th being so devoid of all evidence, except as to the opportunity, that we are unable to see how the judgment

can be sustained. The decision is clearly against the weight of evidence.

The interlocutory judgment appealed from should be reversed. All concur; KELLOGG and LYON, JJ., in result.